Albert R. FIGHT, Plaintiff,

v.

ARMOUR AND COMPANY, Defendant.

Civ. No. 80–2151.

United States District Court,
W. D. Arkansas,
Fort Smith Division.

Feb. 17, 1982.

James M. Llewellyn, Jr., Thompson, Paddock & Llewellyn, Fort Smith, Ark., for plaintiff.

Tim Boe, Rose Law Firm, Little Rock, Ark., for defendant.

MEMORANDUM OPINION

WATERS, Chief Judge.

Plaintiff, Albert R. Fight, brought this action on August 26, 1980, alleging that he was entitled to recover from the defendant by reason of the provisions of the Fair Labor Standards Act (29 U.S.C. § 201 *et seq.*) unpaid overtime compensation due him in the total amount of $8,647.08 plus liquidated damages of an equal amount, and reasonable attorney's fees. He alleges that the defendant was subject to the provi-

sions of such act and that it violated section 7 of the act from October 30, 1976, to June 1, 1980, by employing him in commerce or in the production of goods for commerce for work weeks longer than forty hours without the payment of overtime compensation as required by the act.

In its answer, defendant denied most of the material allegations of the complaint and pled affirmatively, among other things, that it was exempt from the application of the Fair Labor Standards Act.

## FINDINGS OF FACT

The matter was tried to the Court on February 8 and 9, 1982, and from the evidence adduced at such trial, the Court makes the following findings of fact:

1. That during the period relevant to this lawsuit (October 26, 1976, through June 28, 1980) the defendant, Armour and Company, operated a warehousing operation in Fort Smith, Arkansas, through which it handled goods produced outside the state of Arkansas and shipped goods to points outside such state.

2. That prior to October 26, 1976, the defendant hired the plaintiff, Albert Fight, as a "lugger" whose duties were to act primarily as a laborer, and that after serving as a lugger for a period, the plaintiff was promoted to truck driver, but in both of such capacities he was a union employee paid on an hourly basis and received overtime compensation for all hours worked in excess of forty hours per week.

3. That on October 26, 1976, the plaintiff was promoted to foreman of the shipping and receiving department of the Fort Smith operation and at that time his gross wages were increased to $232.00 per week, with subsequent periodic wage increases increasing his gross pay to $289.00 per week at the time that the operation was closed on June 28, 1980.

4. That at the time that he was promoted, the manager of the operation, Bill Darnell, explained to him that it was a promotion and that he would no longer be paid on an hourly basis and would be exempt from overtime provisions of the Fair Labor Standards Act and would not receive overtime for work performed in excess of forty hours per week even though it was expected that he would be required to work in excess of forty hours most weeks.

5. That plaintiff willingly accepted such promotion and agreed to perform the task assigned to him by management and understood that he would be required to work more than forty hours per week most weeks, but would not receive overtime pay for such.

6. That it was a practice of management to require exempt employees such as plaintiff to record their time in a time book kept by the company and such time book was introduced as Exhibit No. 3 at the trial and is a reasonably accurate compilation of the hours worked by the plaintiff.

7. That the operation of the defendant at Fort Smith consisted of two departments or divisions, one being the shipping and receiving department, and the other being the beef department.

8. That the plaintiff was hired as and performed the task of foreman or department head of the shipping and receiving department.

9. That plaintiff's duties as shipping and receiving foreman included:

(a) Supervision of all shipping and receiving functions;

(b) Supervision of an average of eight to nine employees engaged in receiving materials at the operation and in loading trucks with products to be delivered to customers of the operation both within Arkansas and outside the state;

(c) Insuring that the product ordered to be delivered to the operation was received and was in good condition when received;

(d) Insuring that the product held in storage at the operation was kept in good condition and rotated regularly;

(e) Recapping orders and lining them up so that product to be loaded on trucks could be loaded by the employees under his supervision and control in an economi-

cal manner requiring as little work as was necessary;

(f) Supervising the loading of the delivery trucks so that the product could be transported safely and without damage to the product;

(g) Analyzing the orders to be delivered on a particular delivery run and exercising his discretion in selecting the particular size delivery truck to be used for that particular run, based upon the product to be delivered;

(h) Selecting the driver to drive the truck so selected and the employees to load same, and the supervision of such driver and employees;

(i) The hiring of employees to be employed in the shipping and receiving department, and recommendation to his immediate supervisor relative to the hiring of such employees;

(j) Disciplining of employees employed in the department;

(k) Determining the work schedule of the employees employed in the shipping and receiving department with the discretion of allowing employees to be off from work when, in his discretion, he felt there was good cause for same;

(l) The making of recommendations to his immediate supervisor relative to changes in the delivery runs so as to save mileage and fuel, with such recommendations being considered and, in some cases, followed by his immediate supervisor;

(m) Authority to transfer employees from one job within the operation to another, such as from lugger to truck driver;

(n) The acceptance of complaints by employees in the shipping and receiving department under the grievance procedure of the union contract, and attendance at grievance meetings;

(o) The handling of employee complaints which did not come to the point of a formal grievance;

(p) Responsibility for the logs to be maintained by the drivers under ICC regulations, and responsibility for checking them and determining that they were properly kept and directing drivers to complete the logs and disciplining them when such logs were not properly kept;

(q) When a full load of product was received at the operation, authority to select the product to be unloaded from the truck at that warehouse, and what product was to be taken by the truck to outside storage or other locations, and in doing so, used discretion in determining what product was needed at what location;

(r) The taking of orders by phone, including what is known as "will call" in which local customers would pick up product. On "will call" orders, authority to direct which employee gets the product to fill the order and in what manner it was to be done;

(s) Responsibility for security of the product and security of the premises in which the same was stored;

(t) Authority to release product from outside storage;

(u) Authority to direct laborers in the proper stacking of product within the coolers and in maintaining the premises in a clean, litter-free manner;

(v) Responsibility for recording the time of the employees working under him and seeing that the time records kept in this regard were accurate, and the verification of such records and the signing of same to indicate that they were accurate;

(w) Upon receiving product, had responsibility of checking to see what was received and determining and reporting to other persons in management any product not received;

(x) Performed the management function of resealing trucks which were partially unloaded at the operation and sent to other locations, and recordation of the seal number;

(y) During loading of trucks, had responsibility to see that the products ordered were loaded;

(z) Took calls from drivers who had breakdowns or other difficulties on the road and directed them as to action to be taken;

(aa) Responsibility for the training of new employees hired;

(bb) Made decision on when a new employee was ready to work on his own;

(cc) Had duty of inspecting product to determine what goods were damaged and not available for regular sales;

(dd) Spent more than 80% of his work weeks managing the shipping and receiving department; supervising and directing the work of others; engaging in personnel related matters; and considering and making management decisions, using his management skills and discretion in doing so.

## DISCUSSION

To say the least, the evidence adduced at the trial in this case indicates that the facts are in dispute. If Mr. Fight's testimony is taken at face value, during the approximate four years that he was employed as a salaried employee, he was nothing more than a shipping and receiving clerk and made absolutely no decisions relative to anything. He says that he could do nothing without checking with either Bill Spradling or Mr. Darnell, and that all of the functions in "getting up orders," and in loading the trucks and delivering the product to the customer pretty much took place because the employees knew what they were to do and didn't need any supervision. According to his testimony, he did not have authority to tell anyone to do anything, and did not do so. His job, according to him, was simply to pick up the sales tickets from the bus station forwarded by salesmen in the field and to bring those tickets to the plant. He says that at the plant he was required to consolidate these orders into a recap sheet, setting out for the loaders the number of cases of each product, such as bacon or steaks, that were to be taken from inventory to constitute a truckload to be delivered on a particular route. He claims that there was nothing discretionary or supervisory in the action performed by him in converting the purchase tickets to the recap sheet, but that, in fact, this task was a purely clerical task of transferring the information from the purchase tickets to the recap sheet. He says that while the loading crews, under someone's supervision other than his, were selecting the products for the shipment, he completed the purchase tickets by inserting the unit price of the products ordered and calculated the total for the product and the total for the sale for purposes of billing the customer. When the load had been assembled for a truck, he prepared a loading checklist which organized the products in order to permit the products which were to be delivered at the first stop to be placed at the rear of the truck for easy unloading. The route list and order of stops were prepared by someone in the past and presented to him to follow, and that he had no discretion as to the order of stops or unloading. His duty was limited to the clerical task of listing the products in an arrangement that would permit them to be grouped in the order of unloading with the first products to be delivered loaded nearest to the truck entry. He says that during the loading his only duty was to check off the product as it was loaded onto the truck.

As to the unloading operation, he says again that he had no supervisory duties whatsoever, and that his only function was to check the product as it came off to see that his employer got what it should have. When not engaged in these activities, he claims that he answered the telephone, recorded orders telephoned into the plant, and handed products to customers coming to the plant for pickup, and assisted in mopping and cleaning the plant floor when so directed by Bill Spradling or Bill Darnell. His testimony indicates that about the only discretion that he had during the entire time that he was employed as the shipping and receiving clerk or foreman was when to turn the hose on that was used to wash the floor and in what direction to point it.

The Court finds this testimony incredible, if not unbelievable. It is difficult for the Court to believe that this man was paid as a salaried employee for approximately four years with no more discretion or authority than he claims to have had. It appears from his testimony that he was nothing

more than a robot who simply went around doing what someone above him directed him to do, and that he did not, in doing what he was told to do, engage in any thought processes whatsoever.

His testimony relative to his duties was in sharp contrast to the testimony of Bill Darnell, who was the manager of the operation at the time that Fight was hired. He had been employed at the Fort Smith operation of Armour in April of 1947, and had done almost every job available at the operation. He had started as a lugger or laborer and had then become the shipping and receiving foreman. He was then an outside salesman and later was promoted to foreman of the beef department. For the last 19 years prior to his retirement in January of 1980, he was the unit manager or plant manager. It is obvious that Mr. Darnell, having done almost every job at the plant, was well aware of the functions to be performed by each employee and the responsibilities that they had.

It is important to note that Mr. Darnell retired in January of 1980 before the Fort Smith operation was closed in June of 1980, so it does not appear that he has any reason to color or shade his testimony in any respect. As a matter of fact, during his testimony, Mr. Fight indicated that Mr. Darnell was a friend and had always been good to him, and it was evident from his testimony that he expected Darnell to tell the truth.

Darnell testified that he promoted Fight to foreman of the shipping and receiving department, and that it was his job to run the entire "inside" operation. He says that Fight was the supervisor of all of the employees with the exception of the outside salesmen and that he not only had the authority to supervise them, but he did so on a daily basis. The Court does not believe that it would serve a useful purpose to detail the testimony of Mr. Darnell relative to the responsibilities and duties of Mr. Fight, but suffice it to say that the findings of fact set forth above are largely distillations of the testimony of Darnell, and that Darnell's testimony supports, in the Court's view, each of the findings set forth above.

In short, Mr. Darnell testified that he was well familiar with the duties and responsibilities of Fight, and that he was the foreman of the shipping and receiving department and was responsible for its daily operation. He "directed employees all day every day." He says that if the operation had been managed in the manner described by Mr. Fight that it could not have been efficiently run. In short, he says that it simply wouldn't have worked that way, and the Court is inclined to believe him in this regard.

In this respect, Fight called as a rebuttal witness Mr. Richard Longley, who testified that he had been a driver and lugger and had been the union steward. Mr. Longley, who obviously, in the Court's view, wanted to help Mr. Fight obtain some money, confirmed Fight's view that supervision wasn't necessary. He says that the employees knew what they were to do, and that management was superfluous. He says that, in effect, Fight did nothing, but neither did anyone else other than the hourly paid workers. The Court simply does not believe that an operation of the type described in the testimony could have been run without supervision, and believes that at least one cog in the management of that operation was Albert Fight.

He claims that he made no management decisions and had no discretion to do anything, but it is obvious from the testimony, including his, that the recapping function was a very important function in the efficient operation of the warehouse. Fight had to be familiar with several hundred products stored at the warehouse; had to know where each of these products was; had to know and use discretion in determining what the proper and efficient way to assemble the products for a load was; and to use his reasoning ability and discretion in lining up the orders so that an economical use of manpower could be had.

In short, the Court believes that the credible testimony indicates that Albert Fight was the foreman of the shipping and receiving department, and in such capacity he had the responsibility and authority to supervise

the employees in that department, and to run the department in a manner to achieve maximum use of personnel and economy of operation. The Court further believes the believable testimony at the trial indicates that, although Fight, like almost every management employee in any operation, engaged in activities that were clerical in nature, more than 80% of his time was spent managing the shipping and receiving department, and in doing so, supervising and directing employees and, in general, exercising the function of manager of the department.

The Court believes that the evidence clearly indicates that Albert Fight willingly accepted the job as foreman of the shipping and receiving department and was most happy to get the promotion. The evidence indicates that he knew exactly what the job entailed at the time that he took it and that he exercised the typical functions of a manager. He received regular merit increases and, in each instance, Mr. Darnell completed and sent to the home office of Armour a recommendation for the increase on a form provided, making in the process laudatory remarks about Mr. Fight such as "he is dependable in carrying out assigned tasks. He is eager to take on additional responsibilities." (Defendant's Exhibit 9) While the Court recognizes that what the employer calls the employee is certainly not binding, it is important to note that on each of the forms completed by Mr. Darnell, Fight's position or title was shown as Foreman-Shipping and Receiving. Again, while certainly not binding upon the Court, it is certainly interesting to note that when Fight thought that it would serve his purpose to call himself a foreman, he did so. See Defendant's Exhibit No. 4 which is an employment application completed by Fight when he applied for a job with another employer after Armour's plant in Fort Smith was closed. Although at the trial he steadfastly denied that he was ever known as anything other than a shipping and receiving clerk or ever thought of himself as anything but that, in completing the employment application, he indicated that his duties were "Foreman-Shipping and Receiv-

ing." Immediately above Mr. Fright's signature on the application form was a statement indicating that by signing the document, Fight represented that all statements contained in the application were true and correct.

The testimony indicates that, although all other records kept at the Armour operation in Fort Smith were retained by the employer when it closed its Fort Smith plant, Mr. Fight admits that he retained in his possession the time book which contained the hours that he worked. The Court believes that all of the evidence points to the conclusion that the Court has reached that Mr. Fight, after finding himself out of work because of the plant closing, decided that he would set out on a course to obtain a sum of money from the employer. The Court recognizes that this, taken alone, would not warrant the Court finding that Mr. Fight is not entitled to overtime pay, but the Court points to this to indicate why it chooses to believe the testimony of witnesses such as Mr. Darnell, who has nothing to gain or lose by his testimony, rather than that of Mr. Fight who, from all indications, not only has something to gain, but apparently had the intention from the time that the plant was closed to pursue this matter.

In short, the Court believes that the believable testimony introduced at the trial and the documentary evidence introduced supports the findings of fact set forth above.

The Court must now apply the law that is applicable to this case to the facts found. Section 207(a)(1) of the Fair Labor Standards Act provides that, except as otherwise provided in the section, no employer shall employ any employee who in any work week is engaged in commerce or in the production of goods for commerce for a work week longer than forty hours unless such employee receives compensation for his employment in excess of forty hours at a rate of not less than one and one-half times the regular rate at which he is employed.

Section 213 of the act provides that the provision regarding overtime pay shall not

apply to, among other things, any employee employed in a bona fide executive, administrative or professional capacity, as such terms are defined and delimited from time to time by regulations promulgated by the Secretary of Labor.

Pursuant to the authority given in section 213 of the act, the Secretary has caused to be issued regulations defining, among other things, the term "executive." The pertinent regulations are set forth in 29 C.F.R. § 541.1 and provide that an individual may be an executive if:

   (a) he is compensated on a salary basis of not less than $155.00 per week; and,

   (b) his primary duty is the management of the enterprise or a customarily recognized department thereof; and,

   (c) he customarily and regularly directs the work of two or more other employees; and,

   (d) he has the authority to hire or fire employees or makes suggestions and recommendations, which will be given particular weight, as to the hiring, firing or any other change of status of other employees; and,

   (e) he customarily and regularly exercises discretionary power; and,

   (f) he devotes no more than 20% of his hours in the work week to activities which are not directly and closely related to the performance of work described above.

■ The law clearly is that the burden rests first on the plaintiff to prove by a preponderance of the evidence that there exists an employer-employee relationship; that there was engagement in activities within the coverage of the act; that the employer violated the wage requirements; and that a definite amount of compensation is due. *White v. Beckman Dairy Company,* 352 F.Supp. 1266 (W.D.Ark.1973); *Retail Store Employees Union v. Drug Fair Community Drug,* 307 F.Supp. 473 (USDS Dist. of Columbia 1969); and *Johnson, et al. v. Dierks Lumber and Coal Company,* 130 F.2d 115 (8th Cir. 1942).

However, once the plaintiff has made a *prima facie* case covering the elements set forth in the immediately preceding paragraph, the burden then shifts to the employer to prove by a preponderance of the evidence that one of the exemptions afforded by the Fair Labor Standards Act applies to the employment in question. *Idaho Sheet Metal Works v. Wirtz,* 383 U.S. 190, 86 S.Ct. 737, 15 L.Ed.2d 694 (1966); *Mitchell v. Kentucky Finance Co.,* 359 U.S. 290, 291, 79 S.Ct. 756, 757, 3 L.Ed.2d 815 (1959); *Phillips v. Walling,* 324 U.S. 490, 493, 65 S.Ct. 807, 808, 89 L.Ed. 1095 (1945); *Brennan v. South Davis Community Hospital,* 538 F.2d 859, 865 (10th Cir. 1976), quoting *Legg v. Rock Products Manufacturing Corp.,* 309 F.2d 172, 174 (10th Cir. 1962); *Schmidt v. Emigrant Industrial Savings Bank,* 148 F.2d 294, 295 (2nd Cir. 1945); *Wirtz v. Patelos Door Corp.,* 280 F.Supp. 212 (E.D.N.C.1968); *Marshall v. Coastal Group Management,* 88 Lab.Cas. ¶ 33,906 (D.N.J.1980).

■ In proving an exemption under section 213 of the Fair Labor Standards Act, the employer is required to satisfy each of the requirements set forth in 29 C.F.R. § 541.1. Failure to satisfy any one of these requirements is to fail to meet the test for exemption under the act. *Mitchell v. Williams,* 420 F.2d 67 (8th Cir. 1969); *White v. Beckman Dairy Co.,* 352 F.Supp. 1266 (W.D. Ark.1973).

■ In this case, the Court, as found in the findings of fact set forth above, believes that each of the requirements is fully met. The plaintiff was the foreman or manager of the shipping and receiving department of his employer, customarily and regularly directing the work of from eight to ten employees. Regarding the hiring and firing of employees, he at least had the authority and responsibility of making suggestions and recommendations which were given weight as to the hiring, firing or other change of status of employees under his direction and control. He clearly customarily and regularly exercised discretion in his job, and, in the Court's view, he spent less than 20% of his work week engaged in

activities which were not directly or closely related to the performance of his management or executive functions. Thus, the tests are fully met and the plaintiff was, during his employment at Armour and Company between August of 1977 and June of 1980, an executive as that term is defined by the Secretary of Labor as permitted by section 13 of the Fair Labor Standards Act. Since that is the case, the exemption applies, and the employer was not required to pay the plaintiff overtime for the period in question.

## CONCLUSIONS OF LAW

Based upon the facts found by the Court as outlined above, and for the reasons set forth in the discussion above, the Court makes the following conclusions of law:

1. That it has jurisdiction of the parties and the subject matter herein.

2. That between the dates of August 28, 1977, and June 28, 1980, the plaintiff was employed by the defendant in a bona fide executive capacity as that term is defined by regulations promulgated by the Secretary of Labor as permitted by section 213 of the Fair Labor Standards Act.

3. That, as an executive employee, plaintiff was not entitled to receive pay at a rate of one and one-half times his regular rate for hours worked in excess of forty hours per week during the relevant period.

4. That plaintiff is not entitled to judgment in any amount on his complaint filed herein, and that same should be dismissed.

A judgment in compliance with this opinion will be entered.

## JUDGMENT

On February 8 and 9, 1982, the above styled cause of action was tried to the Court without a jury. The plaintiff appeared in person and by his attorney, James M. Llewellyn, Jr., and the defendant appeared by and through its attorney, Tim Boe. Evidence on behalf of the parties was adduced, and at the conclusion thereof, the case was submitted and taken under advisement by the Court. Now, having considered the pleadings filed herein and the evidence adduced at the trial, the Court has prepared and filed herein its Memorandum Opinion relative thereto, and in accordance therewith,

IT IS ORDERED AND ADJUDGED that the plaintiff, Albert R. Fight, take nothing on his complaint filed herein, and that judgment be entered in favor of the defendant, Armour and Company, and that this matter be and it hereby is dismissed with prejudice.